All right, we're going to call the second case, but we'll wait till the courtroom, a little clearer. All right. Case number 22-2135, United States v. Tyrone Maxwell. Hello, Mr. Rossellini. Good morning, your honors, and may it please the court. I'm Nick Rossellini on behalf of the appellant, Tyrone Maxwell. And with the court's permission, I'd like to reserve three minutes of my time for rebuttal. Of course. Thank you. The court promise of the Fourth Amendment is to safeguard the sanctity of the home against physical intrusion by law enforcement. Warrantless searches of the home are therefore presumptively unreasonable, and exceptions to the warrant requirement must be jealously and carefully drawn in this context. For two main reasons, the warrantless search of my client's apartment in this case violated these fundamental principles. First, every fact the officers confronted suggested that nobody was home and that nobody was hurt. Even the government has not disputed that the officers therefore lacked probable cause to believe that an emergency actually existed. And instead, the government has rested its case on the assertion that a warrantless search of the home may be justified based on, and I quote, something less than traditional probable cause. This court should join the D.C. 11th and 2nd circuits in rejecting that position. Second, the purported cause for concern here was that someone behind the door was so gravely wounded that they were unable to cry out for help, dial 911, or respond to the officer's arrival. I mean, unless the police can be confident that no one was home, doesn't an attempt to shoot one's way into a home with a gun almost always raise the possibility that someone inside the home might have been injured? I mean, it really isn't too difficult to imagine any number of scenarios in which an occupant might have been within the line of fire. You know, occupant could have been at the door opening or closing it. They could have been approaching the door. I mean, there's so many. Yes, Your Honor, and I completely understand the concern. And I would analogize this case to the Supreme Court's decision in the United States versus Lange. Just as there, the flight of a misdemeanor will often give rise to exigent circumstances, so too when you have shots fired into a dwelling, that will often give rise to exigent circumstances that will enable the police to enter. But it is not always the case, and the courts must take each case as it comes on its particular facts. And under the particular facts here, there was not probable cause to believe that someone had in fact been hit and was injured. And that is so for six reasons. First, the 911 call did not come from inside the apartment. The neighbors who did dial 911 reported to police officers that they had not seen anyone near the time of the shooting except for the intruders, and they were just across the hall. The people who buzzed in the intruders were not from inside apartment 7. And this was the middle of the day on a Tuesday, which is a work day when people are most likely to be out of the house. And on top of all of that, confirming what all of those facts indicated, the location of the shots, you have two shots fired, and they are laser focused on the deadbolt lock. They are four centimeters apart, and they are right on the deadbolt lock. If the intruders had any reason to believe that someone was behind the door coming to answer it, they would have shot in the middle of the door. They would have spread their fire. It would make no sense to shoot at the deadbolt lock if there was reason to believe that someone was, in fact, behind the door. So the location of the shots confirms that there was no reason to believe that someone was, in fact, behind the door. And, again… You have a lot more confidence in the marksmanship of the criminal class than I do, fortunately. I would encourage Your Honor to look at page 6 of our opening brief where we reproduce the photographs. I've seen the photograph. Yeah. We also… That's a good shot. Well, maybe. It depends on what they were aiming for. We see a lot of cases in which gangbangers are terrible shots. While we're on that subject, could I ask you… Why don't you finish your list of six? That was the list of six, the shots of the six reasons. I lost count. Yeah. So did I, Your Honor. In your reply brief, you suggest that… Let me get the language. This would be a different case if the intruders had fired a spray of bullets across Maxwell's door. I mean… Well, that might be a more powerful case. But that seems to suggest to me that you think the police have to make some very finely-honed judgments about the intentions and marksmanship of these unknown gunmen. I don't think they're fine-tuned at all. We always require the police officers… Yes, they're quick judgments, but we always require them to analyze the totality of the circumstances and come to a conclusion. And in that hypothetical with the spray of bullets, the only reason to do that that is sensible is because there's a reason to think someone is behind there and you mean to do them harm. Why do they have to have sensible reasons? Because the officers have to make an assessment of what happened here. What are we likely to confront when we get inside? And two bullets… Again, the picture. These are laser-focused on the door. This is a small landing. They were a foot away. They were clearly trying to shoot out the lock and get in. So all indications, on top of those other facts that I mentioned earlier, suggest that this was a failed attempt to break into an unoccupied apartment by firearm. Mr. Rossellini, the briefs in this case do lots of quotations of verbal formulas adopted by this court and different courts in exigent circumstances cases. I would find it helpful to focus as much as possible on the facts of those cases as distinct from the rhetoric used. And can you direct us to cases involving gunfire in a residential setting that did not find exigent circumstances? Yes, Your Honor, and I have two. The first one is the Ninth Circuit's decision in Lemus v. Merced County, and the reporter's site is 711 Federal Appendix 859. And there the Ninth Circuit held that gunshots at or near a residence do not itself establish probable cause. That's not precedential. It is not. It's not the Eleventh Circuit's decision in U.S. v. Tynman. There were bullet holes in the home there, and the Eleventh Circuit held that there was not probable cause to enter. Actually, it's a strange case where the bullet holes were found in one apartment originating from an adjoining apartment, and there were not sufficient grounds to enter the shots from where they originated from. And again, I'm not saying that those pieces are on a – Tynman, you said? Sorry? Tynman? Tynman. It's 741 F3rd 1170. And neither of those cases – I'm not saying that those are factually on point with this situation, but neither is Schmidt. Neither is the government's – the 28-J they submitted late last night, the Sixth Circuit's 17-year-old decision in Huffman, where you have automatic weapons broadsiding an entire home, shooting out all of the windows. And although the officers were able to see some bullet holes in the house, they had no way to be confident that they had seen where all the rounds went. And that's really the point here, is that you have to look at the totality of the circumstances, and there is no hard and fast rule, as the two cases I cited help demonstrate, that shots fired at or near a residence are invariably going to constitute probable cause to enter. But look, now we know, of course, that no one was lying injured. But you have to try and imagine the uproar if someone had been lying injured, and the police shrug their shoulders and they say, well, you know, no one answered our knocks. We didn't get a 911 call from anyone in the apartment, so we didn't think anyone was inside, and we just left. I mean, now that would really be a case, wouldn't it? Yeah, two points in response, Your Honor. And again, I understand the concerns here for the protection of human life. That's obviously very important. But the officers, again, once they got a clean view into the apartment, that concern that Your Honor mentioned evaporated. They were worried that someone was so gravely wounded behind the door that someone could not cry out for help, dial 911, or respond to the officer's arrival. They opened the door. There's no gunshot victim. There's no blood. There's no other signs of distress. It just confirms what all the facts up to that point had indicated. So even if you disagree about the initial entry and whether that constituted probable cause, once they opened the door, any probable cause that existed, if you think that's the case, was vitiated. And again, I would emphasize— You really don't think that they should have, you know, gone around, looked in the closets as they did? Even an injured occupant, maybe not—I mean, any bullet wound would be a big injury for me, you know, or you, or any of us. But, you know, people might hide. You know, they don't know—they might have been unconscious by then, or they may not believe that this was the police, or they might not trust— I don't know. There are such a myriad of reasons to, you know, look around. There are many possibilities, but as this court has said time and again, mere possibility is not enough. You need affirmative reason to indicate that an improbable scenario has actually occurred. And this is what the government is asking this court to deem as a fair probability would have happened. We were worried that someone got shot behind the door. We opened the door. Nobody was there. So we're worried that someone had been shot. They didn't leave behind a drop of blood. They ran away. They managed to hide themselves—stuff themselves into a closet, and then they lost consciousness so quick, within minutes, that they were unable to respond, despite the absence of blood anywhere in the apartment. And maybe that's conceivable, but that's simply just not sufficient, as this court held in Delgado. There has to be some affirmative reason to believe that that improbable scenario might have happened. And I take Your Honor's point that if it turned out that this kind of—there was a freakishly bad— someone had freakishly bad luck and it resulted in a tragedy, that would be awful. But again, we are dealing with an ex-ante probability here, and the Fourth Amendment kind of strikes that calculus for us, is that yes, we would save more lives if the officers didn't need to get warrants, if they never needed improbable cause. And what's the calculation? What's the percentage? The percentage—the Supreme Court has cautioned against putting any kind of number on this, so I'm a little bit reluctant to do that. But with Your Honor's leave, I would say maybe it's 10% to 20% improbable cause. It's all to the calculus, however. Yeah, so it's not 51%. It's not more likely than not. But it has to be a meaningful chance. It's not conceivable. And what the government is really trying to tell you here is that a mere threat to human life just is grounds to go inside, basically, on the lowest amount of suspicion imaginable. And that argument is really that when the officers are not acting in a law enforcement capacity, instead they're out to save lives, they don't need to demonstrate probable cause. But that is a textbook definition of the community caretaking exception. If you read the First Circuit's decision in Cornelia, that is what the First Circuit said in justifying the warrantless search there for the purposes of protecting human life, and that is exactly what the Supreme Court reversed in Cornelia. And so now, under Cornelia, the question is, is there probable cause to believe that an emergency actually exists? And even the government in this case has not disputed that they cannot meet that standard. They instead pay lip service to probable cause, ask you to water it down, and say, hey, we can jump over the bar when it's down here, not here where the Fourth Amendment consistently requires. Mr. Roslin, let me move you forward to the time frame after the officers are inside. There's this disagreement, potentially 60 to 90 seconds. Sergeant Barksdale's body camera shows a cabinet being opened, then the testimony being to the contrary. I know that you represent your client on appeal but not at trial. Isn't there a waiver of that particular argument because the topic of remand was raised and the defense didn't take the court up on that? No, Your Honor, because we're not arguing that this case comes out a certain way because of the cabinet search. We merely raised that issue because the district court relied on it in its decision and said I'm signing off on even the closet searches. We're going all the way in there because they didn't look where no one could be found. We're just asking the court not to rely on that conceitedly false premise. And we commend the government for their candor in correcting that. But, no, so the record as is, the cabinet searches, they happened, but we're focused here on the fact that there was not probable cause to search the closets. I'm happy to answer more questions. I would like to reserve some time. I have one other question. Certainly, Your Honor. Your brief makes a big deal out of the use of the sledgehammer to break in the door. But you seem to be positing a category of exigencies where it's okay to go in if you have a key but not if you don't. What does that look like and where do we find that in? Yeah, so that's United States v. Brown. And there the opinion of the court said, look, we acknowledge this case is not a true emergency. There is not probable cause to believe that somebody is hurt. But there's still some cause for concern here. We're worried. That's kind of like this case. There's not probable cause to believe someone's actually been hit and needs our help. But there are shots fired at a dwelling. There's cause for concern here, which we acknowledge. In that situation, and assuming you don't think probable cause is the bar, what that opinion says is that less intrusive searches require less justification. So that's almost an alternative argument where if we're just taking Brown as it comes, and we don't think that case stands anymore, but the sledgehammer matters if you're just applying Brown straight up and down because we're at a similar level of concern. Thank you. Okay. Thank you, Your Honors. And you will get your rebuttal time, so don't worry about that. I appreciate that, Judge Roedner. Thank you very much. Ms. Boyle. Good morning, Your Honors. May it please the court, counsel, my name is Catherine Boyle on behalf of the United States. Defense counsel here says the government believes that police officers can go into an apartment on what he terms a mere threat on the lowest reasonable suspicion imaginable. I'd just like to re-ground us to the facts of this case in light of that statement. On the afternoon of August 20, 2019, two men conned their way into a secured apartment building and shot through the door of apartment 7, leaving bullet holes in the door, shells and holster in the hallway. Police arrived at the scene quickly following a 911 call from the neighbors who let the men in, and then the neighbors heard gunshots. These accident circumstances justified the officer's warrantless entry and limited search of the apartment. This is something we talk about a lot in this court, but I think it bears repeating in this case. The ultimate touchstone of the Fourth Amendment is reasonableness. As the Supreme Court observed in Brigham City, under the accident circumstances exception, police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with injury. In Brigham City, the objectively reasonable basis was believing both that the injured adult in the kitchen might need help, the court said, and that the violence in the kitchen might just be beginning. Seen through the lens of United States v. Schmidt, this court has observed that the prime exigency may be the potential for wounded victims. In Schmidt, the officer didn't need to know that a person had been shot to go into the backyard. The case specifically says people in the backyard may have been shot. This also coincides with this court's decision in Hansen v. Dane County, which explained that probable cause in the accident circumstances context requires a good reason to act. And something we haven't talked about yet are the facts of that case, which involved a 911 call and then an unanswered return 911 call. Interestingly, in that discussion, the court points out that certainly one of the possibilities is that there is some sort of emergency going on due to the situation, but the court notes that there are other possibilities. They say a child could have called. There are these various other options. But nonetheless, the court concludes that that was a good reason to act and go in and check on the well-being of the residents. In my opinion, the coniglia also supports the government's theory in this case. Certainly in that case, the Supreme Court invalidated the First Circuit's community perception. But importantly, that was after the First Circuit had determined that the government had forfeited the accident circumstances argument based on those same facts. When you look at Chief Justice Roberts and Justice Kavanaugh's concurrence in that case, they make it very clear that accident circumstances might support, in some instances, a similar situation that previously would have fallen under the community caretaking exception. An example Justice Kavanaugh gives in his concurrence is very telling. He says he believes accident circumstances would justify officers entering a dwelling if an elderly man who usually went to church on Sunday didn't show up at church and then when individuals tried to call him and officers knocked on the door, there was no response. And he says that that... In this case, was there any effort made by the police before they broke open the front door to determine whose apartment this was or to reach that person? Your Honor, they did knock on the door, announce police, and try to contact any occupant of the apartment, and they did not hear a response. But then, I think at that point they were focused on getting into the apartment as quickly as possible so that they could render aid if there were an injured occupant inside. But in Justice Kavanaugh's example, you know, they know it's some elderly man. Here, you know, they didn't try to determine, is what I think you're telling me, whose apartment this was. I know they spoke to the neighbors. It's not clear from the record exactly what their conversation was with the neighbors, so it's not clear what they knew at that point. It's clear from the record that they did not know whether or not somebody was home, which might be the case at the elderly man's apartment too. I also think there's potentially, in terms of the level of investigation you want to do, where in the elderly man's situation, Justice Kavanaugh notes that they made phone calls and they made a couple of other efforts. That is a situation where he suggested one of the primary concerns might be that the person had fallen and needed help on a fairly quick basis, but that's a bit different than somebody who has a gunshot wound where really a matter of seconds or minutes can make a big difference as to what kind of aid medical personnel are able to render. And that's one of the reasons the officers in this case also had called an ambulance to be on standby. And speaking of investigations, what are we to make of the police officers opening the kitchen cabinet and peeking between the mattresses? Yes, Your Honor. First, I wanted to offer a brief correction on that point to what Defense Counsel said. There were two body camera videos that were produced in this case, and one of the body camera videos showed the opening of a small cabinet that a person could not have fit in. Obviously, when you're doing a check for injured persons, you don't want that to happen. In this case, however, it seems that the officers were going through the apartment. This is outside the record, of course, but it seems that the officers were going through the apartment very quickly, opening a couple of cabinets that were big enough for an individual to fit in and shouldn't have opened that one, but nothing was found. And there was no sort of fruits of that encounter that poisoned the rest of the search. So it was an error, and it was also – and I also wanted to correct the record as well. We're not sure which body camera belonged to which officer. We need to confirm that with the officers themselves. But the small cabinet is on one of the body camera videos, and it seemed possible based on a review of the video in total it wasn't the officer who testified at the hearing. And do the body camera videos – maybe outside the record – is that where the 60 to 90 seconds comes from? I think Barksdale testifies to 60 seconds, but never in the record do we ever see anything longer than 90 seconds for the search. Is that correct? Yes. Sergeant Barksdale testifies to the minute to minute and a half in the suppression hearing, but also the videos – I would want to double-check on the exact time length, but it's definitely under two minutes, the presence in the apartment. Ms. Boyle, did the police have solid evidence or information that the shooters had fled as opposed to possibly having been admitted? From my review of the record, every indication was the shooters had fled, but I don't know that it was a certainty, but that seemed to be the assumption people were operating under at the time. So when you take Brigham City, Schmidt, Coneglia, these descriptions of what could constitute exigent circumstances and this allowance that when you are looking at exigent circumstances, there can be another possibility as to what's going on. You don't have to have certainty there's an injured person. With that as a guiding light, under the totality of the circumstances, the officers' warrantless entry into and brief search of Mr. Maxwell's apartment for an injured person were objectively reasonable.  The courts don't require the facts known to an officer to support a belief that he will find an injured person. The facts must substantiate his belief that there's a compelling reason to look. To go back to United States v. Schmidt, that's a case where in Milwaukee, around 10.30 p.m., there is a series of gunshots fired near an intersection. Within an hour, officers learn that an individual who's been shot in the leg is recovering. That person is taken to a hospital. It's not until 1 a.m. and after officers have blanketed the entire area that an officer is walking around and notices some bullet holes in a car and in the wall of a duplex and some shell casings, and he goes into a fenced backyard to check for wounded persons. In Schmidt, this court said the prime exigency was the potential for wounded victims, not necessarily the threat of a further shooting. They said it wouldn't have made—the court said it wouldn't have made sense for an officer to wait for a warrant when a shooting victim could have been dying in the yard, nor did the officer need to know that someone had actually been shot in order to go into the yard and check. This case is very aligned with Maxwell. Here, the totality of the circumstances supported a reasonable belief that an individual in the apartment may have been recently shot and be in need of immediate aid. To recap, you have the 911 call. You have two unidentified men ringing apartment 8 and conning their way into the building. At least one of them is wearing rubber gloves. The neighbors hear several gunshots. They see a gun holster in the hallway. The officers arrive quickly, see bullet holes, two shell casings, a holster. They don't know if somebody's home. They don't know if the men responded after—if the men fired after somebody responded to their presence. The door is a very dangerous place to fire into. That is, if somebody hears a noise or if somebody's trying to open or close the door, that is where the person might be standing, and this was not a large apartment either. The door opens directly onto the living room. You can see the entire living room, and then off to the left, there's a very small galley-style kitchen, and there's the bedroom. So you have these officers. There wouldn't have been a lot of places for somebody to go as they're approaching the door if shots are fired into it. The officers announce their presence. There's no response. They call an ambulance. And unlike Schmidt, this is a case where the gunfire was almost immediately proceeding. There was a lapse of minutes, we believe, until the officers got there, but it was a very quick event and there wasn't really time for anybody else to have checked on the occupant to the apartment. You wouldn't have to change too many facts here, though, to say this was going too far, right? This is a very— Gunshots, let's say, into the ceiling rather than through a door, or no gunshots at all, right? Yes. This is a very fact-specific analysis, and with various gradations, you could come to a conclusion that accident circumstances did not support the officer's entry. Suppose it's not a small apartment but a 12-room house. We still have particular concerns about the door. In the United States versus Huffman, which admittedly did involve more of a drive-by shooting that had a larger amount of gunfire, they still did think that it was appropriate to check the rest of the house for victims in that case. So it is one of those situations where you really do need to go on a case-by-case basis to decide what's objectively reasonable for the officers to do at this time, which, of course, we have the benefit of doing in hindsight. The officers just show up at the scene, see bullet holes in the door, which actually appear to have missed the lock potentially. I'm not sure how far the lock extends beyond the silver mechanism that you can see. And that might be exactly where somebody would stand if they're going for a doorknob inside. So the officers' resulting legitimate safety concerns regarding the occupant supported the search. And Judge Roebner, as you play it out, can you imagine if the police took the opposite approach and a fatality occurred? There would be an outroar, and I understand why. If the shots were fired into a door and nobody decided to check on the person in the apartment. I also wanted just to note briefly, Mr. Maxwell's focus on the gunman's belief regarding his presence at the apartment isn't particularly helpful to the analysis here. There's really no evidence that anybody knew whether somebody was in the apartment or not and whether the gunman were firing at the door because they wanted to get in and steal something when they believed Mr. Maxwell wasn't home versus whether they were firing at the apartment door because they wanted to get in and injure Mr. Maxwell, perhaps while firing through the door or after. That's not really relevant to the analysis because we have no idea what their intent was. We don't know what they wanted to do inside that apartment. The district court was also correct in determining that accident circumstances justified the scope of the search. This court has held previously in United States v. Arch that where accident circumstances are based on an officer's concern regarding an injured person, the search is appropriately limited to places an injured person might be found. That is particularly appropriate here where there would be substantial motivation for an injured person to hide. I mean, somebody has just shot through their door. They hear noise outside. They might not even be sure if they hear somebody saying, police, if that's a police officer or if that's just a second attempt to get into their apartment. It could be a terrifying experience. And the district court also credited the testimony of Sgt. Barksdale that somebody could be shot without significant bleeding. Defense makes very little of that, but it's certainly possible to be shot and have internal bleeding that doesn't spill out of your body. So the district court credited that fact and it was reasonable for the district court to do so. We also believe the use of the sledgehammer was justified under the circumstances. This is a situation where there had been a violent shooting into a door targeting the apartment. The officers attempted lower force measures. They tried to reach out. They tried to kick the door in. At a certain point, we have to decide if it was okay to kick the door in. Why is it not okay to use a sledgehammer? We don't want them to go for the highest force option at once, but if we consider human life to be the primary concern here, which we should, using a sledgehammer was not unjustified in that context and in the context of all the case law on this issue. I'm running a little out of time, so I wanted to make one more brief point on the independent source issue. I checked, and it is true that the affidavit to the warrant did not mention loose cannabis. We don't think that changes the independent source analysis in our brief, though. Essentially, if you have a targeted shooting of an apartment, an electronic money counter, and the smell of cannabis, even if perhaps the smell of cannabis alone might not be enough for a probable cause for a warrant, all those things combined certainly point to illegal drug-dealing activity. Countess, I see I'm out of time. Do you have any further questions? I don't. No. We'll rest on that in our brief. Thank you. Thank you, Ms. Boyle. Thank you. Mr. Rossellini. Would you give Mr. Rossellini his full three minutes, please? Thank you. Thank you again for your consideration, Judge Rovner. I just have four points to make in rebuttal. First, once again, we did not hear from the government say that they can meet a traditional probable cause standard. All that they say is that Hansen somehow created a watered-down definition of probable cause that lowers the quantum of suspicion from here down to here that is unique to the exigent circumstances context. As we note on page 9 of our reply brief, that is simply not true. What Hansen said is that probable cause does not mean certainty, or even more likely than not, that a crime has been committed or that a medical emergency is ongoing. And it's cited at Illinois v. Gates. Hansen is applying the everyday definition of probable cause that sets the bar, not insurmountable, but it's up here. And the government still has not said that they can meet that bar. Second, the government effectively conceded that Schmidt is a different case. You have a spray of gunfire that indicates that there was an attempted hit on a person. And just like Huffman, as the government also effectively conceded, it's another different case. You have to look at these specific facts. As to Cornelia and the facts of Cornelia, we agree with Justice Kavanaugh's concurrence and the other opinions in that case that if a family member calls 911 and says, hey, I'm worried about my grandmother. She's always at church. She's never missed ADM service, and she's not there. That is probable cause to believe that an emergency exists. You have a credible account from a close family member who knows this person's habits and has enough cause for concern that they are worried enough to call 911. That's probable cause to believe an emergency. The exigent circumstances exception would apply in that case. We agree with that. The difference, though, is that there is highly credible evidence that an emergency in fact exists, and it's just lacking here. Again, I take the government's point that if, again, you have a freak situation and somebody was shot and people would be upset about that, of course that's the case. It is a tragedy. But the fact remains that ex ante, that probability is just so very low on the facts of this case that it does not constitute probable cause. And, again, the Fourth Amendment, for better or for worse, assumes that the price of these protections will occasionally be a situation where the police are not able to do everything conceivable to protect human life. That is just the reality of the calculus the Fourth Amendment draws. And finally, Your Honors, just briefly on the record, first, the government continues to misstate Sergeant Varksdale's testimony about the blood. All he did was agree that someone can be shot and not bleed significantly. He does not say that someone can have a serious gunshot wound and not bleed. He says nothing about the possibility of internal bleeding that leaves no external trace. The reference in that portion of the transcript clearly refers to a graze wound or other minor wound. But in that situation, someone who has a graze wound and is scared for their life, they're going to dial 911. They're going to respond. Second, the neighbors at JA-78 were explicitly asked by the police, have you seen anyone else here? And they had not. So they had no reason to believe that somebody was home. And I see that I'm out of time. I have one more thing to say. Do it. Say it. This one's minor, so perhaps it wasn't worth it. But the cabinet openings were on actually both body camera footage, on both sets of body camera footage. So two officers did it. Again, we just asked the court not to rely on the assertion that the officers didn't search somewhere where a person couldn't be found. But I do think it's worth accurately stating that for the record. So thank you very much for the time. And if there are no further questions, we respectfully request that you reverse the judgment. Mr. Rossellini, before you run away from us, thank you so much. You were appointed by the court. And we really want to thank both you and your law firm, Latham & Watkins, for doing such a fine job for your client and for coming all the way from San Francisco. And we all hope that you will have a very nice trip back. And, again, much appreciated. And, as always, we thank the government and Ms. Boyle for the fine job she always does for us. So the case is going to be taken under advisement, and the court is going to take a 10-minute recess.  Thank you, Your Honor.